[Civ. No. 8482.   Third Dist.   Jan. 17, 1955.]

WOODBRIDGE REALTY (a Corporation), Respondent, v. PLYMOUTH DEVELOPMENT CORPORATION et al., Appellants.

Blewett, Blewett, Macey & Garretson and Mazzera, Snyder & DeMartini for Appellants.

Warmke, Arbios, Woodward & MacKillop and Leon E. Warmke for Respondent.

VAN DYKE, P. J.—This action was brought by plaintiff and respondent as assignee of licensed real estate brokers to recover a commission from defendants. Judgment was given as prayed for in the complaint and the defendants appeal.

The trial court found as follows: That plaintiff's assignors were licensed real estate brokers; that on March 9, 1950, Plymouth Development Corporation, which was then the owner of real property near Stockton, executed and delivered to plaintiff's assignors a document containing the following:

"We hereby issue Woodbridge Realty One Hundred Twenty (120) day authorization to sell in one block, all lots known as Plymouth Village (Corner of Alpine and Plymouth Road) County of San Joaquin, State of California, for One Thousand and No./100 ($1000.00) per lot. All lots to be approved according to F.H.A. Specifications.

"We also agree to pay Woodbridge Realty a commission of Fifty and No/100 a lot if sold to any person with whom Woodbridge Realty has negotiated and notified us in writing of such negotiation within five (5) days after expiration of this authorization.

"It is expressly understood that this authorization to sell is non-exclusive."

The court further found that Plymouth Village consisted of property, a legal description of which appears at length in the findings; that some time before March 9, 1950, Plymouth Development Corporation had orally requested plaintiff's assignors to find a buyer for Plymouth Village and that pursuant thereto said brokers had negotiated with William Blackfield and with Goheen Construction Company for the sale of said land to them; that within a few minutes after receiving the above document the brokers delivered to Plymouth Development Corporation a communication reading: "In accordance with our listing agreement on Plymouth Village we hereby notify you that we have negotiated with the following: Wm. Blackfield . . . , Goheen Construction Co. . . . "; that said brokers at once negotiated further with Blackfield and obtained from him a "firm and specific oral

offer'' for the purchase by him of Plymouth Village; that the terms of said offer were suitable and acceptable to Plymouth Development Corporation as seller and that said seller ''did in fact accept said offer''; that the brokers orally communicated both offer and acceptance to the respective parties and that the seller and the buyer entered into ''an oral agreement'' for the purchase and sale of Plymouth Village; that thereupon the seller and the buyer designated Louis T. Arbios, an attorney at law, to prepare a written contract embodying the oral agreement; that while he was preparing the agreement the seller repudiated the oral agreement and refused to go further in the matter of the sale; that Blackfield was at all times ready, willing and able to purchase Plymouth Village on the terms and conditions so offered and accepted and was at all times ready, willing and able to enter into a written contract embodying said terms and conditions and offered to do so and to execute a written contract binding upon both the seller and the buyer; that Blackfield would have executed such a contract except for the repudiation and breach by the seller of said oral agreement and its refusal to enter into a written agreement; that the brokers were the procuring cause of obtaining Blackfield as such purchaser so ready, willing and able to act and that the repudiation of the seller was the sole cause of a written contract not having been entered into.

It appears that whatever cause of action the brokers had against Plymouth Development Corporation, the burden thereof passed on to a copartnership later formed which consisted of the individual defendants.

The complaint contained a second cause of action in the form of a common count for services performed by plaintiff's assignors as real estate brokers and the court found that the allegations of the common count were true.

Appellants contend in substance that the foregoing findings of fact are without support in the evidence; that the document of March 9, 1950, which we will call the ''brokerage contract'' did not comply with the statute of frauds which requires such contracts or some memorandum thereof to be in writing and signed by the party to be charged, and that the brokers did not produce a purchaser ready, able and willing to buy the subject property.

We will treat of the second contention first. We think little need be said concerning this assignment of error. The requirements for a writing or memorandum to meet

the statute of frauds are well set forth in 9 California Jurisprudence 2d, section 40, pages 185-186:

"All the terms of the employment of a real estate broker need not be in writing, if the fact of employment is sufficiently certain from the writing. . . . ▮ And the memorandum is not required to be an instrument by the terms of which the agent is empowered so to bind the principal as to support an action for specific performance. It is sufficient if it shows that the broker is authorized by the principal to find a purchaser who is ready, willing, and able to buy or exchange, or one with whom a sale or exchange is actually consummated. . . . ▮ However, the memorandum must describe the property with sufficient certainty to identify it. ▮ And . . . must be signed by the party to be charged. . . .

"The statute does not require a formal written contract, but merely some note or memorandum thereof . . . For example, a letter, or the contract between the principal and the person procured by the broker, or escrow instructions may satisfy the requirements of the statute if appropriate language is used."

We also quote the following from *Pray* v. *Anthony*, 96 Cal.App. 772, 777 [274 P. 1024]:

"As uniformly held by numerous decisions in this state upon the subject, the essential part of a contract to employ a real estate broker, so far as the statute of frauds is concerned, is the matter of the employment . . ."

▮ Applying these rules to the document issued to the brokers by the proposed seller, we hold that it was a sufficient memorandum to satisfy the statute. It contained an express authorization to sell within a time fixed, a promise to pay a commission and a description of the property by name. As to this last requirement, there is no claim that the description was insufficient and it is apparent from the record that the parties all understood exactly what property was referred to by the name "Plymouth Village." This property had been purchased by the proposed seller for subdivision purposes and although a formal subdivision map had not yet been filed for record, it is apparent that the name "Plymouth Village" contained in the broker's contract could, as found by the court, have been readily translated into a metes and bounds description.

The remaining two assignments of error can be treated together as they both are concerned with the sufficiency of the evidence to sustain the findings set out above. These

findings were all sufficiently supported by the evidence received. Disregarding, as we must, all conflicts, and, without unduly lengthening this opinion by reciting all of the evidence which supports the trial court's decision, we find the following:

Woodbridge Realty was a copartnership engaged in real estate brokerage, and Albert L. Smith and Bruce Barcus, two of the copartners, were the ones who were active in the transactions herein involved. P. N. Alexander was secretary, Henry Brandstad was president, and Verni H.. Seekatz was treasurer of Plymouth Development Corporation. P. N. Alexander was mainly in charge of the affairs of the corporation with respect to the purchase, subdivision and sale of Plymouth Village. He informed Smith and Barcus that the corporation was acquiring Plymouth Village which would subdivide into about 200 lots and he wanted Smith and Barcus or their partnership to look for a buyer. This they did. Their attention was brought to Blackfield as an interested party. Blackfield was a contractor and builder of many years' experience who had developed a number of tracts containing from 100 to 400 homes each and his financial ability to buy Plymouth Village was well proven. He himself testified that he could readily and easily have purchased the property upon the terms which the trial court found were offered by him and accepted by the seller. After a number of telephone conversations concerning his purchase of Plymouth Village, Blackfield came to consider Plymouth Village as suitable property on which to build low-cost homes under F.H.A. regulations. The tract was adjacent to sewers and water and capable of improvement so as to meet F.H.A. requirements. Alexander had told Smith and Barcus that the seller would sell Plymouth Village for $1,000 a lot with the improvements required to meet F.H.A. rules put in at the seller's expense. It is quite apparent from the whole record that the brokers, the sellers, and Blackfield were all quite familiar with F.H.A. requirements for low-cost homes and that the term "F.H.A. Approved" was one of definite meaning to the parties involved. Smith and Barcus reported to Alexander that they had two prospects and shortly before the brokers' contract was given, Blackfield had been sufficiently interested to request the brokers to get written authorization for the sale of the property. Thereupon Smith and Barcus on the morning of March 9, 1950, went to the offices of Plymouth Development Corporation. Alexander and one

Barnett, both members of the corporation, were there. At this meeting Smith and Barcus told these men that they had been dealing for the sale of the land, that they had a definite prospect for its purchase and that their partnership wanted protection as to its commission. Alexander answered that they could have such protection and that they should have a written authorization before they went further. The brokerage contract was then prepared, signed and delivered to the brokers. Smith and Barcus then gave the written notification hereinbefore quoted that Blackfield had been negotiated with, as well as Goheen Construction Company. The broker's contract was shown to President Brandstad who expressed approval, telling Alexander to "go ahead." Immediately after receiving the broker's contract Smith and Barcus interviewed Blackfield at Mountain View, where he was engaged in a home development project. They told Blackfield they had written authorization to sell Plymouth Village and that if Blackfield would make his offer they would convey the offer to the owner. They told Blackfield where the land was, described it to him, showed him a tentative subdivision map which they had received from Alexander, and mentioned the sewer facilities and other matters pertinent to a sale. Blackfield told them he knew the tract and that it was not necessary for him to come to Stockton to look at it. He then gave them an offer to buy. It was oral and of course not binding on him at that time, but it is apparent that both he and the brokers contemplated a written contract to embody the terms of the offer. The offer was to buy Plymouth Village for $1,000 a lot, fully improved according to F.H.A. specifications, the seller to put in the streets, curbs, gutters, sidewalks, storm drains, if necessary, and sewers, so as to obtain F.H.A. approval, but with Blackfield, the buyer, putting in the necessary water and electricity. The buyer was to pay $10,000 immediately and to deposit $90,000 in escrow with the title company, to be drawn upon by the seller as it put in the improvements, the balance of the purchase price of $1,000 per improved lot was to be paid within a year. Blackfield stipulated that he wanted the seller to convey two lots to him so that he could erect two model homes. The other lots were to be deeded to him for moneys paid and to be paid and all the lots were to be deeded and all the purchase price was to be paid within one year. Blackfield told Smith and Barcus to have the agreement drawn up by an attorney and that when that was done he would sign the agreement and go

through with the deal. They asked him if he wanted his own attorney to draft the contract and when he said he did not they suggested Mr. Arbios of Stockton, whom Blackfield approved since he was personally well acquainted with him. Smith and Barcus returned to Stockton, contacted Alexander, told him of their meeting with Blackfield and asked that he call a meeting of the members of the selling corporation. This was done within a day or two. Smith, Barcus and a third partner, Clifford K. Woodbridge, attended the meeting. There were present all of the directors, officers and stockholders of the seller. Smith and Barcus submitted to them the precise terms of the offer Blackfield had made and these were discussed for some time. It was made known that Blackfield was the proposed purchaser, his business and business experience were related, the brokers informed the members of the seller corporation as to the various home development projects which Blackfield had completed, and they were told that Blackfield was willing to have Mr. Arbios draw up the formal agreement. At the end of the meeting the brokers were told that the matter would be further discussed in private by the members of the corporation and their conclusion would be communicated to the brokers. Several days thereafter Alexander met with Smith, Barcus and Woodbridge and told them the terms and conditions of Blackfield's offer were agreeable, that the corporation would sell, that the corporation had accepted the offer and that the brokers could now go ahead and have the agreement drawn. It was stated that Mr. Arbios was accepted as the attorney to draw the contract. The brokers then telephoned to Blackfield, acquainting him with what Alexander had told them and he replied, "Fine and dandy, go ahead and have Mr. Arbios draw the papers." Smith, Barcus and Alexander thereafter participated in having Arbios prepare the desired contract. They gave him the terms of the offer of purchase made by Blackfield and accepted by the seller. Arbios requested Alexander to get a legal description of the tract. This he did, obtaining a preliminary report from a title company, which he delivered to Arbios. There was some delay in the preparation of the contract, one reason being that a metes and bounds description of the two lots to be immediately conveyed was needed and it took some time to get this. About one week after Arbios had been told to prepare the agreement a meeting was arranged between Alexander, Smith and Barcus to go to Arbios' office. The brokers and Alexander met at the latter's office and started

to go to Arbios' office. They stopped for coffee at a coffee shop and while there Alexander told Smith and Barcus that the members of the corporation had changed their minds, that they would not go through with the deal that had been agreed upon and that they had now decided to require Blackfield to do the required improving of the lots at his own expense in addition to the purchase price of $1,000 per lot. Smith and Barcus protested to Alexander that this additional requirement that Blackfield improve the land at his own expense was contrary to what had been verbally agreed upon and mutually consented to, but Alexander replied that while he personally wanted to go ahead the other members of the corporation did not. Arbios was then called on the telephone and told that the seller had "backed out of the deal" so that the agreement had to be cancelled. Although there was much evidence of efforts made thereafter by the brokers to make a different deal with Blackfield whereby the additional requirements as to improvements at Blackfield's expense would be agreed to by him their efforts were unavailing. Blackfield himself described the proposal as "fantastic." It was further shown that in November, 1950, a contract for the sale of Plymouth Village was entered into between the partnership which succeeded the corporation as owner of the tract, and a corporation whose stock was owned by Blackfield and his wife. The selling partnership embraced in its members all or nearly all of those who had owned the stock of the corporation. Under this contract substantially the same terms and conditions were agreed upon as had been orally agreed upon the previous March, save that a slightly higher price was paid for each lot. Blackfield, as to this deal, testified that he controlled a number of corporations, of all of which he was president and general manager, and the owner of most of the stock; that when he purchased a tract for improvement the title was taken by one or another of these corporations, depending each time mainly upon the tax picture of the various companies. It was further shown that shortly before this sale was made the corporation which owned Plymouth Village was dissolved; a partnership among its members was substituted, and took title to its properties including Plymouth Village; and that the partner had been informed by counsel that if these things were done and the sale was made by the partnership they would avoid any liability to their former brokers for commissions.

We think the foregoing evidence amply supports the trial

court's challenged findings. ■ In order that a broker may recover a commission it is not always necessary that a binding contract be shown to have been executed between the buyer and seller. Under a brokerage contract such as was here executed it was only necessary that the brokers find a purchaser who was ready, able and willing to purchase and who would offer to purchase upon terms acceptable to the seller. Said the Supreme Court in *Twogood* v. *Monnette,* 191 Cal. 103, 107 [215 P. 542], as quoted in *Coulter* v. *Howard,* 203 Cal. 17, 25 [262 P. 571]:

" ' . . . It is also established law in this state that a written contract between the seller and the purchaser is not essential to the recovery of the broker's commission if he has produced to the seller a purchaser who is ready, willing and able to purchase upon the terms proposed by the seller and who has agreed to those terms and is willing and offers to enter into a binding written contract. The broker has performed his duty and has earned his commission regardless of whether a written contract is actually entered into or whether the sale is ever consummated by the delivery of the property and the payment of the purchase price.' " (See also *Umphray* v. *Hufschmidt,* 73 Cal.App. 140 [238 P. 749], and *Ford* v. *Cotton,* 82 Cal.App. 675 [256 P. 301].)

Here the seller in its authorization to the brokers contented itself with a very brief statement of the terms upon which it would be willing to sell, saying only that the brokers were authorized to sell "Plymouth Village for $1,000 per lot, all lots to be approved according to F.H.A. specifications." However, under the circumstances this brief statement of terms meant a great deal. The parties were contemplating the sale of a tract purchased for subdivision purposes and which the seller was then engaged in subdividing. It is quite apparent, as we have said, that all those who negotiated about the matter understood quite well what was meant by F.H.A. approval. The trial court was fully justified in concluding that this brief statement of terms of sale closely approximated Blackfield's offer which the brokers brought back to the seller. That offer contained all the terms expressly stated in the offer to sell and was amplified with particulars as to the mode and method under which the actual purchase would be accomplished and the property taken and paid for. It is apparent from the lack of testimony to the contrary that the offerer and the offeree fully understood just what was intended and what was orally agreed upon and there is nothing to indicate

that the seller in "backing out of the deal" did so because of any uncertainty in Blackfield's offer of any material variance from the authorization; or that the formal agreement could not have been and would not have been readily prepared for execution because of any lack of certainty as to terms and conditions. ■ Under such circumstances the rule laid down in *Coulter* v. *Howard, supra,* applies. We quote from page 26:

". . . 'Whether the sale was prevented by the failure of perfect title or by the mere will of the vendor makes no difference. In either case the compensation had been earned by the agent. *Smith* v. *Schiele,* 93 Cal. 144 [28 P. 857]; *Phelan* v. *Gardner,* 43 Cal. 306-311; *Justy* v. *Erro,* 16 Cal.App. 519-522 [117 P. 575]; *Neilson* v. *Lee,* 60 Cal. 555; *Stanton* v. *Carnahan,* 15 Cal.App. 527-529 [115 P. 339].' (*Purcell* v. *Firth,* 175 Cal. 746, 750 [167 P. 379].)"

■ When matters had progressed to the stage where the seller was satisfied with the proposal of the buyer and with the buyer himself so far as his character and ability were concerned, where the terms of the purchase had been made sufficiently definite that the draftsman could be given instructions to proceed with the contract document, and where both buyer and seller had orally agreed upon these terms the seller could not under the sanction of law arbitrarily refuse to go forward and yet say to the brokers that they had not performed all of the obligations necessary to be performed by them in order to earn their compensation. It was wholly the business of the seller whether, not being yet bound by written agreement, it should refuse to go forward with the sale, but the refusal to go forward could not affect the right of the brokers to the compensation they had earned. The trial court was fully justified in finding from the evidence we have related that the sole reason a binding contract of sale between buyer and seller was not executed was the refusal of the seller to proceed. ■ "The law requires of the vendor good faith and the doing of no intentional act to discourage, embarrass, or prevent the completion of the purchase." (*Coulter* v. *Howard, supra.*)

Appellants contend that all the brokers did failed to measure up to the production of a purchaser ready, able and willing and offering to buy on terms acceptable to the seller, because the offer of Blackfield was conveyed to the seller by its own brokers rather than direct from Blackfield to the seller by some other medium or personally by Blackfield

himself. They cite certain cases which superficially seem to bear out their contention, although they admit that such a contention is against the generally-declared rule of law upon the matter. They quote the following from *Frank Meline Co.* v. *Kleinberger*, 77 Cal.App. 193 [246 P. 136] :

" . . . in the absence of any specific agreement to the contrary, a broker employed to sell real estate has earned his commission when, within the life of his contract . . . , he has produced a person who is ready, able, and willing to purchase the property on terms satisfactory to the seller, and has obtained a binding and valid contract for a sale on terms proposed by the seller, or has brought the seller and buyer together and thus enabled them to enter into a contract of sale, or has produced such a purchaser who has verbally accepted the seller's terms and offered to enter into a written contract embodying the said terms and binding upon both parties . . . ; but unless the intending purchaser has entered into such binding contract or has offered to the vendor *and not merely to the broker,* to make such an agreement, the broker has not earned his commissions." (Emphasis added.)

We have examined the cases cited by appellants in support of this contention as to the way in which the broker may "produce" a purchaser, but we are unable to agree with them that these cases furnish any authority for denying recovery in the case before us. ▬ Seller and broker do not deal at arm's length, but engage to deal fairly and reasonably, one with the other. ▬ Where, as here, the broker had no authority to sign a binding contract on behalf of the principal, it behooved the principal to act honestly and fairly and to cooperate with the broker in the matter of consummating the proposed bargain by the execution of a binding agreement if that was desired. It is clear from this record that the principal neither expected nor required a cash deal and anticipated, on the contrary, that a formal contract of sale embodying terms agreed upon would be prepared and executed. The brokers did all they could do or were required by the principal to do in progressing towards that consummation. The principal neither asked nor suggested that Blackfield be produced in the sense of being personally brought to the principal. ▬ The purpose and the duty of the brokers, and the only thing which under their authorization they could finally accomplish, was to bring the seller and the buyer to "a meeting of the minds." According to the evidence, this essential result they accomplished. This having been done,

the seller thereafter, by refusing to go further in the way of formalizing the consensus, could not defeat the brokers' right to be paid for their services. As said in *Owen* v. *Spangler*, 111 Kan. 484 [207 P. 772, 773] :

"Decisions which refer to the necessity of bringing the parties together have reference to bringing their minds together on a contract. Physically, the persons may be thousands of miles apart. It is not necessary that they ever see one another or communicate otherwise than through the agent."

The judgment appealed from is affirmed.

Peek, J., and Schottky, J., concurred.